Ricky Lynn HUFF, Appellant,

v.

The STATE of Texas, Appellee.

No. 56093.

Court of Criminal Appeals of Texas, Panel No. 1.

Feb. 14, 1979.

Rehearing En Banc Denied March 21, 1979.

Charles T. Pritchard, Jr. and Jack K. Allen, Houston, for appellant.

Carol S. Vance, Dist. Atty., Alvin M. Titus and Charles C. Cate, Asst. Dist. Attys., Houston, for the State.

Before ONION, P. J., and PHILLIPS and TOM G. DAVIS, JJ.

OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for murder. Punishment was assessed at twenty years.

Appellant contends that the trial court erred in allowing the prosecutor to use

grand jury testimony during cross-examination of his wife.

The evidence is uncontradicted that the appellant shot the deceased on a grocery store parking lot in Houston on July 11, 1975. Appellant's wife testified that this shooting was the conclusion of a chain of events starting six weeks earlier.

Mrs. Huff testified that in early May, 1975, the deceased had followed her around the grocery store while she shopped and later followed her to her home. Even after she had gone into her residence, the deceased continued to drive back and forth in front of her home. She testified that similar conduct by the deceased had occurred on some five other occasions.

On July 11, 1975, Mrs. Huff, with her two-year-old child and accompanied by her friend Dianne Wittsche, was again followed by the deceased from the store to her home. Mrs. Huff testified that as she exited her friend's car the deceased grabbed her and told her to come with him. Mrs. Huff screamed and her friend honked the horn of the car in an attempt to attract the attention of the appellant, who was in the house.

The appellant testified that when he realized his wife was in distress he armed himself and went outside. The deceased was no longer present, but appellant's wife explained what had occurred. According to the appellant's and his wife's testimony, the deceased then again passed the house. Mrs. Huff identified the deceased as the man who had followed her. The appellant testified that he attempted to pursue the deceased in Wittsche's car, but was thwarted when the car would not start because of the seat belt interlock system. After some confusion and discussion, the appellant, his wife and child, with Wittsche driving, left in belated pursuit of the deceased. The stated reason for this pursuit was to return to the parking lot, hoping that the deceased had done the same, in order to get his car's license number. The gun was in the car, placed in the passenger's seat during the appellant's attempt to start the car.

The foursome reached the lot to find the deceased standing beside his car. Wittsche stopped her car beside the deceased's car. The relative location of the two cars and other buildings and objects was painstakingly diagrammed by each witness present when the shooting took place. These diagrams were not preserved and included in the record, thus these locations remain unclear to this Court. Nevertheless, the testimony is clear that the appellant got out of the car, confronted the deceased, and shot him twice.

The appellant testified that the deceased denied following his wife, and then threatened to kill the appellant. At this time Wittsche started forward in her car and the appellant grabbed his gun just as the car went out of his reach. Appellant testified that he entered the deceased's car on the passenger side, struck the deceased with the pistol, and that the gun discharged during this scuffle. Appellant stated that he got out of the car and saw the deceased get out on the other side. Thinking that the deceased was about to retaliate, the appellant testified that he again shot the deceased.

Other witnesses present in the lot gave testimony conflicting with the appellant's account of the shooting. A witness sitting in his truck waiting on members of his family testified that he first saw the appellant walk around his truck and then heard two shots. This witness also testified that he heard no verbal confrontation. Police who investigated the shooting testified that the body was found beside the rear fender of the deceased's car. Investigating officers also stated that no blood or tissue was present in the car and that the passenger side door was locked, thus contradicting the appellant's version of the shooting.

The appellant then got back in Wittsche's car and left the scene. He turned himself in to the police the next morning.

The manager of the grocery store testified that a month prior to the shooting the appellant's wife had complained about a man following her from the store. Another employee present at that time confirmed his story.

The wife's testimony was material to appellant's claim of self-defense, not only to

show the prior conduct of the deceased toward her but also to corroborate the statement that the deceased had threatened to kill appellant. The prosecutor cross-examined her extensively on her prior testimony to the grand jury. This cross-examination centered around the occasions when the deceased had followed her and her testimony regarding the fatal night. The following excerpt was typical of the prosecutor's use of the prior testimony:

"Q.  Again, referring to State's Exhibit 4 [grand jury testimony],[1] Mrs. Huff, referring to Ricky now, did you hear Ricky say anything at that time after the first shot?

"A.  No.

"MR. PRITCHARD [defense attorney]: Same objection, Your Honor.

"THE COURT: Same ruling.

"MR. PRITCHARD: Note my exception.

"Q.  'Did you hear him say anything to the man after the second shot?'
   Answer: 'No, I didn't hear him say nothing.'
   Question: 'What did he say to you when he got in the car?'
   Answer: 'He just told Dianne, "Go." He didn't say nothing to me until we got—I don't remember nothing.'
   Do you remember saying that to the Grand Jury?

"A.  I don't remember anything in the Grand Jury. It has been a year ago and I just don't know. That man could have gotten me to say anything, because every time I opened my mouth, he was just screaming and hollering at me."

Other portions of the grand jury testimony read to the jury during this cross-examination concerned the first time the deceased followed the witness home, the route she took to and from the store, her report of the incidents to the store manager, the days of the week that she went to the store, the events on the parking lot on the fatal night, and what she heard during the events on the parking lot.

Appellant contends that the prosecutor's reading of the prior grand jury testimony was improper as he failed to lay the proper predicate for this impeachment. Defense counsel objected to the prosecutor's reading of the prior testimony to the jury and objected to its use as hearsay. Defense counsel continued to object throughout the cross-examination, finally requesting a running objection. All of his objections and requests were overruled. The objections, as shown above, finally evolved into a "same objection," followed by the trial court's "same ruling."

■  The proper predicate for impeachment by prior inconsistent statement requires that the witness first be asked if he made the contradictory statement at a certain place and time, and to a certain person. *Ellingsworth v. State*, Tex.Cr.App., 487 S.W.2d 108; *Huffman v. State*, Tex.Cr.App., 479 S.W.2d 62. If the witness denies making the contradicting statement, it can then be proved by the prior inconsistent statement. *Ellingsworth v. State*, supra; *Thrash v. State*, Tex.Cr.App., 500 S.W.2d 834. If the witness admits the prior inconsistent statement, however, the prior statement is not admissible. *Wood v. State*, Tex.Cr.App., 511 S.W.2d 37.

■  During the lengthy cross-examination of appellant's wife, the prosecutor repeatedly failed to elicit a denial of the prior statement from the witness before reading the grand jury testimony. Often the prior testimony read by the prosecutor was consistent with the witness' testimony at trial. On at least 14 occasions, much as in the example above, the prosecutor read the testimony to the witness and asked if she remembered making the statement, without first eliciting a denial of the prior statement. This use interjected into evidence a large portion of the grand jury testimony that was inadmissible. When an instru-

---

1.  While the grand jury testimony was marked as State's Exhibit # 4, it was never admitted into evidence but is included in the record before us.

ment is read (into the record), it is introduced just as if the prosecutor had the instrument marked and introduced into evidence as an exhibit. *Erwin v. State*, 171 Tex.Cr.R. 323, 350 S.W.2d 199 (1961); *Hellman v. State*, 103 Tex.Cr.R. 603, 281 S.W. 874 (1926). See also *Harden v. State*, 417 S.W.2d 170, 174 (Tex.Cr.App.1967); *Richardson v. State*, 475 S.W.2d 932, 933 (Tex. Cr.App.1972); *Killion v. State*, 503 S.W.2d 765 (Tex.Cr.App.1973), and cases there cited. *Newbern v. Spiro*, 387 S.W.2d 769, 770 (Dallas Ct. of Civil Appeals, 1965).

We hold that the prosecutor's reading of the grand jury testimony was improper impeachment as he failed to lay the proper predicate. Considering the importance of the wife's testimony to the appellant's defense, we cannot say that this impeachment was harmless. We hold that allowing the prosecutor to proceed in this use of the grand jury testimony over appellant's repeated objection constitutes reversible error.

In the event of a retrial of this cause, we express concern regarding other issues raised in this trial. First, in *Roberts v. State*, 162 Tex.Cr.R. 41, 280 S.W.2d 285, this Court held that the State could not compel the defendant's wife to testify in front of the grand jury and then use that testimony to impeach her when she is a witness on behalf of her husband.

We also note that the prosecutor stated to appellant's wife during cross-examination that she had been offered a polygraph test. This Court's prior decisions regarding polygraph tests render such practice highly suspect. *Romero v. State*, Tex.Cr.App., 493 S.W.2d 206; *Lewis v. State*, Tex.Cr.App., 500 S.W.2d 167; *King v. State*, Tex.Cr.App., 511 S.W.2d 32; *Reed v. State*, Tex.Cr.App., 522 S.W.2d 466; *Leach v. State*, Tex.Cr. App., 548 S.W.2d 383; *Robinson v. State*, Tex.Cr.App., 550 S.W.2d 54.

The judgment is reversed and the cause remanded.